**Wendell OLK**

v.

**UNITED STATES of America.**

**Civ. No. LV 2076, RDF.**

United States District Court,
D. Nevada.

Feb. 11, 1975.

George Bouchard, Laguna Hills, Cal., Bart M. Schouweiler, Reno, Nev., for plaintiff.

Lawrence J. Semenza, U. S. Atty., John R. Lusk, Asst. U. S. Atty., Las Vegas, Nev., Yale F. Goldberg, Tax Div., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

CLARY, Senior District Judge (Sitting by Special Designation).

This action for a tax refund was tried to the Court on January 20, 1975. The case presented by plaintiff was brief and the Government offered no testimony, contenting itself with the introduction of two exhibits. Although only one issue is presented for resolution, the outcome is of some interest in Nevada. The Court must determine whether monies or "tokes" which were received by plaintiff from patrons of the casinos where he worked were taxable income or gifts.

Gross income, from which taxable income is computed, is succinctly defined:

Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) compensation for services, including fees, commissions, and similar items; . . . . Int.Rev.Code of 1954, § 61.

Tips are specifically included in gross income according to the applicable regulation:

(a) *In general.* (1) wages, salaries, commissions paid salesmen, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, . . . are income to the recipients unless excluded by law . . . . 26 C.F.R. § 1.-61–2(a)

Plaintiff contends that the monies are not income as defined above, but gifts from the patrons specifically excluded from gross income. "Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance. . . . ." Int.Rev.Code of 1954, § 102(a).

This divergence of opinion is the heart of the controversy and presents a nice question. To characterize the monies received as "tips," which the Government does, assumes the answer. Such monies will, therefore, be referred to as "tokes," a colloquial term, until their legal and taxable status is determined.

### FACTS

The underlying facts do not present an area of significant dispute. In 1971 plaintiff was employed as a craps dealer in two Las Vegas gambling casinos, the Horseshoe Club and the Sahara Hotel. The basic services performed by plaintiff and other dealers were described at trial. There are four persons [1] involved in the operation of the game, a boxman and three dealers. One of the three dealers, the stickman, calls the roll of the dice and then collects them for the next shooter. The other two dealers collect losing bets and pay off winning bets under the supervision of the boxman. The boxman is the casino employee charged with direct supervision of the dealers and the play at one particular table. He in turn is supervised by the pit boss who is responsible for several tables. The dealers also make change, advise the boxman when a player would like to drink and answer basic questions about the game for the players.

Dealers are forbidden to fraternize or engage in unnecessary conversation with the casino patrons, and must remain in separate areas while on their breaks. Dealers must treat all patrons equally,

---

1. There are actually five individuals, the boxman and four dealers. The dealers work 60 minutes and then get a 20 minute break, repeating the process throughout the eight hour shift. The result is a crew of three dealers on and one off at any given time. Every time a different dealer takes his break, the remaining three change position so that each will serve as dealer and stickman throughout the shift.

and any attempt to provide special service to a patron is grounds for termination.

At times, players will give money to the dealers or place bets for them. The witnesses testified that most casinos do not allow boxmen to receive money from patrons because of their supervisory positions, although some do permit this. The pit bosses are not permitted to receive anything from patrons because they are in a position in which they can insure that a patron receives some special service or treatment.

The money or tokes are combined by the four dealers and split equally at the end of each shift so that a dealer will get his share of the tokes received even while he is taking his break. Uncontradicted testimony indicated that a dealer would be terminated if he kept a toke rather than placed it in the common fund.

Casino management either required the dealers to pool and divide tokes or encouraged them to do so. Although the practice is tolerated by management, it is not encouraged since tokes represent money that players are not wagering and thus cannot be won by the casino. Plaintiff received about $10 per day as his share of tokes at the Horseshoe Club and an average of $20 per day in tokes at the Sahara.[2]

Plaintiff's 1971 tax return was audited by the Internal Revenue Service and he was assessed a total of $792.42 in additional taxes, interest and penalties based on the tokes from the casinos which had not been reported as income. Plaintiff paid this amount, filed a timely Claim for Refund, and then commenced this suit.

## DISCUSSION

■ A payment of money cannot be both compensation for services and a non-taxable gift. The terms are mutually exclusive. Bogardus v. Commissioner, 302 U.S. 34, 58 S.Ct. 61, 82 L.Ed. 32 (1937). In the leading case of Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), the Supreme Court defined the term "gift" for purposes of the Internal Revenue Code.

A gift in the statutory sense, on the other hand, proceeds from a "detached and disinterested generosity," . . . "out of affection, respect, admiration, charity or like impulses." And in this regard, the most critical consideration, as the Court was agreed in the leading case here, is the transferor's "intention." 363 U.S. 278, 285–86, 80 S.Ct. 1190, 1197 (1960) (citations omitted).

■ Of equal importance for purposes of this case is what the Supreme Court excluded from the definition of a gift, "And, conversely, '[W]here the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it.'" In the accompanying footnote, the Court referred to cases including "tips" in gross income as "classic examples" of situations where the payment was not a gift for tax purposes, citing Roberts v. Commissioner, 176 F.2d 221 (9th Cir. 1949). Commissioner v. Duberstein, 363 U.S. 278, 285, fn. 7, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).

■ The characterization given to the transaction by the donor is not determinative; there must be an objective inquiry made to determine whether a gift in name is also one in fact. Commissioner v. Duberstein, *supra*; Bogardus v. Commissioner, *supra*. Accordingly, whether the payment is a gift or taxable income is a question of fact to be determined by a consideration of the specific circumstances of the case, Commissioner v. Duberstein, *supra*; Woody v. United States, 368 F.2d 668 (9th Cir.

---

2. The major reason for this difference is the fact that the Horseshoe Club is located in downtown Las Vegas while the Sahara is on "The Strip." Patrons of Strip casinos are generally wealthier, or willing to wager more, than their counterparts in the downtown casinos and thus will give a larger toke to dealers.

1966), emphasizing the experiences of the fact-finder with human nature.

Decision of the issue presented in these cases must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case. The nontechnical nature of the statutory standard, the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirm us in our conclusion that primary weight in this area must be given to the conclusions of the trier of fact. Commissioner v. Duberstein, 393 U.S. 278, 289, 80 S.Ct. 1190, 1198 (1960).

For present purposes, a tip may be defined as a payment of money to an individual who has rendered a service, either as additional compensation, because of the quality or promptness of the service or, as a result of social compulsion, because the recipient feels obligated to give the individual a sum of money beyond what is charged for the service itself. In either event, the giving of a tip is closely related to the performance of a personal service and has become "expected" to the extent that it is no longer, if it even was, the product of "detached and disinterested generosity." Because of the tie to services rendered and social compulsion, the status of tips as taxable income is well established. Andrews v. United States, 295 F.2d 819, 155 Ct.Cl. 584 (1961), cert. denied, 369 U.S. 829, 82 S.Ct. 846, 7 L. Ed.2d 794 (1962) (taxicab driver); Roberts v. Commissioner, 176 F.2d 221 (9th Cir. 1949) (taxicab driver); Meneguzzo v. Commissioner, 43 T.C. 824 (1965) (waiter).

Plaintiff does not dispute the fact that tips are taxable, but instead strongly argues that tokes are not tips. He is challenged in this contention by the Government which has cited Bevers v. Commissioner, 26 T.C. 1218 (1956) as dispositive of the issue. The facts of Bevers are identical with those in the present case. The petitioner, Bevers, was employed in Las Vegas casinos as a dealer in blackjack, roulette and dice (craps). His duties as a craps dealer were the same as those performed by plaintiff here, and the same rules prohibiting fraternization with patrons applied. Dealers on each shift pooled the money they received from patrons, and management acquiesced in the practice.

Relying on its decision in Roberts, affirmed by the Ninth Circuit, the Tax Court held that the "side money" received by petitioner constituted taxable income. This Court, having scrutinized the evidence and the Bevers opinion with great care, has come to the conclusion that the Tax Court misapplied the principles enunciated in Roberts.

The Court is of the opinion that the Tax Court failed to take into account the uniqueness of a dealer's activities when compared to those engaged in by a cab driver or one in a similar service capacity. In Roberts, tips were directly related to personal services performed by the cab driver. The driver's compensation by his employer was fixed according to a formula, and he was forbidden to solicit tips. He was not, however, forbidden to accept tips. The driver was thus presented with two possibilities. He could go out of his way to be friendly and helpful to his passengers, thereby encouraging them to recognize the superior quality of the service rendered and to tip him to show their satisfaction. In the alternative, he could provide adequate or inferior service and rely upon social compulsion to force the passenger to tip him or endure his scowl or verbal disapproval. Because the custom of tipping individuals such as cab drivers was so well known, the reluctant tipper was almost certain to be aware of it and its attendant compulsive aspects. The same considerations would also apply in the case of waiters/waitresses and others similarly situated.

The dealer finds himself in a different position. Only a limited number of people are employed as dealers, and these only in Nevada. This in itself is one of the unique aspects of this case, since decisions regarding tips in other callings are made in light of conditions prevailing generally across the country and on the basis of national experience. If he attempts to render special service to a patron, a dealer is subject to immediate termination. He is forbidden to engage in the personable conduct which others rely on to obtain or increase the amount of a tip. He does not furnish a *personal service,* but merely carries out the duties of his employment. This is a critical distinction since while a cab driver or waitress furnishes a basic service to the employer, to the general benefit of the customer, as well as a personalized service to the customer both in impact and *manner* of performance, the dealer furnishes only the basic service to the employer and must adopt an impersonal attitude toward the patron. Thus, there can be no "service-tip" for a dealer since he is forbidden to perform the type of special service which historically forms the basis for an additional payment of money.

Neither can a dealer benefit from the "social compulsion-tip" as can others. Testimony at trial indicated that only 5 to 10% of those who play will give money to a dealer or, stated in reverse, that 90 to 95% of those who play will *not* give anything to a dealer. Such evidence indicates that patrons are either unaware of such a practice or decline to indulge in it. In either event, there can be no compulsion to tip irrespective of service since the dealer is forbidden to display any disapproval and is unable to retaliate by lowering the quality of service, and the other patrons are either consciously or unconsciously oblivious so that no peer pressure is exerted.

Further, patrons' satisfaction with a dealer's service is not dictated by the quality of service itself, which does not vary, but by that phenomenon known as "luck." A player's luck is beyond any possible control by the dealer, assuming the game is an honest one. This is not so in other situations where satisfaction is dictated by service within the complete control of the individual performing it.

The Court believes that money given to dealers does not come as an "incident of the services performed" as the Tax Court found in *Bevers.* The dealer functions in an almost machine-like manner and performs no service which the Court feels is compensable by patrons by means of the traditional tip. The fact that tokes are pooled and divided is not significant. It may well be a means of self-protection adopted by dealers lest the ill fortune of patrons fall upon one more than upon others. It also strengthens the assertion that since all perform equally, all share equally in their collective good, or bad, fortune. Management's acquiescence could well indicate that it is preferable to have all share equally rather than have dealers attempt to give special attention to particular patrons in order to increase their individual amount of tokes. Even attempts to provide special service which are successful would gain a dealer little since he would have to share the proceeds with the others or risk termination.

After a careful consideration, the Court finds that the evidence presented by the plaintiff is sufficient to sustain a determination that tokes are gifts within the meaning of § 102(a).[3] The only evidence in the record indicates that dealers were paid a salary which they felt was fair and adequate for the functions they were to perform, and they were not told they would receive addi-

3. As a result of this finding, the Court need not consider what other possible categorization of these monies would be appropriate under the Internal Revenue Code. However, such an inquiry would have been pursued of necessity if the monies were found to be neither tips nor gifts.

tional compensation in the form of tokes. This is not a situation where the evidence justifies the inference that management used tokes as camouflaged compensation and thus paid dealers lower wages than they otherwise would have had to pay. The Government had ample opportunity to introduce evidence to show that tokes were used by the casinos as "incidents of service" and thus within the ambit of the "tip" cases previously decided. Its failure to introduce such evidence cannot now be used to the plaintiff's detriment.

The determinative factor in gift cases is, " . . . the intention with which payment, however, voluntary, has been made." Commissioner v. Duberstein, 363 U.S. at 286, 80 S.Ct. at 1197, *quoting* Bogardus v. Commissioner, 302 U.S. at 45, 58 S.Ct. 61 (dissenting opinion). Testimony by witnesses indicated that players were moved by sudden impulses of generosity to share their good fortune with others. Money was given not only to dealers, but to other players and even mere spectators in the vicinity of the game. Some players may well give money to others in the superstitious belief that the recipient is "lucky" for them and that by sharing part of the winnings their good fortune will continue. The fact that the lucky player and the recipient may be unknown to each other is not detrimental to plaintiff's case, but serves to emphasize the spontaneous nature of these transactions. However irrational this mode of behavior may appear to some, it is not an unusual occurrence in gambling casinos of Nevada.

The fact that such happenings take place only in fairly small and geographically well-defined areas should not be used to deny them the status which these unique settings and situations provide. These spontaneous or superstitious impulses fall within the realm of possibilities contemplated by the Supreme Court in *Duberstein* and thus meet the test for a gift under the Internal Revenue Code: a product of detached and disinterested generosity. The Court therefore makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. This is a suit for refund of Federal income taxes, interest and penalties in the amount of $792.42 for calendar year 1971.

2. The amount of $792.42 represents the taxes, interest and penalties assessed against plaintiff by the Internal Revenue Service based upon receipt of monies from patrons in the casinos where plaintiff worked which had not been declared as income.

3. Plaintiff paid this amount in full.

4. During 1971, plaintiff was employed as a craps dealer at both the Horseshoe Club and the Sahara Hotel in Las Vegas, Nevada.

5. As a dealer, plaintiff performed services for his employers for which he was paid a daily wage.

6. Plaintiff worked an eight hour shift. His duties, when a stickman, were to call the roll of the dice and collect them for the next shooter. His duties, when a dealer, were to pay all winning bets and to collect all losing bets for the casino. At all times he was under the supervision of a boxman who was in turn supervised by the pit boss.

7. Plaintiff and other dealers were not permitted to fraternize with casino patrons, and were required to remain separated from patrons when taking breaks or eating. All contact was kept to an absolute minimum.

8. As a dealer, plaintiff treated all patrons equally and rendered no special personalized service of any kind to any patron.

9. An attempt to render special service would result in plaintiff's immediate termination.

10. Patrons would sometimes give money to dealers, other players or mere

spectators at the game. Patrons would sometimes place bets for the dealer.

11. There is no obligation for a patron to give anything to a dealer, and there is no social compulsion for him to do so.

12. Between 90–95% of the patrons who gamble give nothing to a dealer.

13. Dealers perform no service for patrons which a patron would normally find compensable.

14. All monies given to dealers (tokes) must be placed in a common fund to be divided equally among all dealers at the table.

15. Management acquiesces in this practice although it does not favor it because it keeps money out of play.

16. There is no direct relation between services performed for management by a dealer and benefit or detriment to the patrons.

17. The tokes are given to dealers as a result of impulsive generosity or superstition on the part of players, and not as a form of compensation for services.

18. Tokes are the result of detached and disinterested generosity on the part of a small number of patrons.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this suit. 28 U.S. C. § 1346(a)(1); 26 U.S.C. § 7422(a).

2. Tokes received by plaintiff from patrons of the gambling casinos were not compensation for services performed by plaintiff, but gifts within the meaning of section 102 of the Internal Revenue Code of 1954.

3. Plaintiff is entitled to judgment against the defendant in the sum of $792.42 with interest and costs.

4. In the event of any discrepancy between the Discussion portion of the Memorandum and the Findings of Fact. the Discussion is to be controlling.