HUMBERTO J. FERNANDEZ AND JULIA FERNANDEZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fernandez v. Commissioner
Docket Nos. 8285-74, 8617-76.
United States Tax Court
T.C. Memo 1984-380; 1984 Tax Ct. Memo LEXIS 294; 48 T.C.M. (CCH) 591; T.C.M. (RIA) 84380; July 24, 1984. *294 Held, respondent's reconstruction of "toke" income received by petitioner while employed as a blackjack dealer in 1972 and 1973 sustained. Held further, because petitioner failed to maintain records of his toke income received during the years at issue, respondent's determinations of additions to tax under sec. 6653(a), I.R.C., sustained. Humberto J. Fernandez and Julia Fernandez, pro se. Ivan A. Gomez, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: In these consolidated cases respondent determined the following income tax deficiencies and additions to tax: Docket
Addition to tax under
No.
Year
Deficiency
sec. 6653(a)
8285-74
1972
$1,689.96
$84.50
8617-76
1973
1,751.00
87.55
*295 The issues presented for our decision are (1) whether petitioners understated the amount of "toke" (tip) income received by petitioner Humberto J. Fernandez during taxable years 1972 and 1973; and (2) whether petitioners are liable for the addition to tax for negligence under section 6653(a), I.R.C. 1954, for each of the years in question. FINDINGS OF FACT Some of the facts have been stipulated and are so found. [1] The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Humberto J. Fernandez and Julia Fernandez were husband and wife during the years in question. They resided at 2657 McLeod, Apt. #2, Las Vegas, Nevada when they filed their petition in docket No. 8285-74 and at 7321 Southwest 18th Street Road, Miami, Florida when they filed their petition in docket No. 8617-76. Petitioners filed joint Federal income tax returns for 1972 and 1973 with *296 the Office of the Internal Revenue Service at Ogden, Utah. The amounts here in dispute relate to the activities of Humberto J. Fernandez, and when used hereinafter in the singular, "petitioner" will refer to him alone. During 1972 and 1973 petitioner was employed as a blackjack dealer at a $2 table at the Las Vegas Hilton Hotel (hereinafter the Hilton). [2] Petitioner generally worked an 8-hour shift and was paid a regular salary or $32 per day during the years in question. He received salary for a total of 248 days during 1972 and 271 days during 1973. Petitioner had approximately 10 days of paid vacation from his employment during each of these years. In addition to his regular salary, petitioner received "toke" (tip) income from players in the casino. He did not maintain any record of the tips received during 1972 and 1973. On *297 their joint Federal income tax returns for 1972 and 1973, petitioners reported the following amounts of income received by petitioner as a blackjack dealer: Year
Wages
Tips
Total
1972
$7,921
$1,558
$ 9,479
1973
8,672
3,166
11,838
It is common practice for gamblers at the Hilton to tip dealers, either by handing the dealers a playing chip (toke) or by placing a bet on their behalf. During 1972 and 1973, all blackjack, roulette, and Big Six dealers pooled the tokes they received by placing them, before the end of their shifts, in a common toke box kept at the end of the roulette table. The total amount so pooled was collected by three or more dealers at approximately 11:00 every morning, cashed in at a cashier's cage, and then equally divided among all dealers who had been on duty during the prior 24-hour period. Because the division was made on an equal basis, it did not take into account the fact that different dealers worked at $2, $5, $10, and $100 tables. Dealers generally received their shares of tip income in sealed envelopes, bearing no names, when they returned to work at the beginning of their next shift. Respondent commenced an in-depth *298 investigation into the reporting of toke income by dealers employed at the Hilton. He requisitioned and classified all income tax returns filed by all dealers employed at the Hilton for the taxable year 1972. He then conducted detailed examinations of approximately 30 of those returns and personal interviews with each dealer whose return had been selected for the in-depth examination. Financial information was obtained from various financial institutions and source and application of funds and bank deposit analyses were performed with respect to each of the dealers selected for in-depth audit. Finally, respondent examined diaries recording toke income received in 1972 by Fred Angeloh and Robert Moen, two dealers who were employed at the Hilton during part of 1972, in the respective amounts of approximately $38 and $44 per shift. Angeloh supplied respondent with a notarized attestation to the accuracy of his toke record. Moen supplied respondent with an affidavit attesting to the accuracy of his toke record. Based on his overall examination, respondent determined that dealers at the Hilton received at least $44 a day in tip income. In order to verify this determination, respondent's *299 agents conducted a surveillance project at the Hilton. Specifically, undercover agents observed the dealers' exchanges of tokes for money at the cashier's cage on 11 days during the period November 28, 1973 through August 16, 1974, 9 days in the latter part of 1973 and 2 days in 1974. The plan used for selecting observation dates was designed to account for variations in toke income which generally occurred on different days of the week. Respondent rotated different agents on the surveillance project in order to prevent their detection. The agents watched most of the exchanges from the next cashier's window or from a nearby house phone. The tokes exchanged were placed in racks of 5 rows, each row holding 20 chips. Each color chip had a specific value. The agents were able to determine the approximate amount of cash received on each exchange by counting the number of rows of the various colors of chips and then calculating their equivalent in money's worth. Occasionally, the agents were able to get close enough to the cashier's cage to read from slips of paper the computations arrived at by the dealers or the cashier. The agents recorded their observations on surveillance memos *300 within a short time after the toke exchanges. Afterwards, the agents served summonses on the Hilton to determine the number of dealers employed during the 24-hour shifts preceding each observation and hence the number of dealers sharing in each pool. The surveillance project revealed that the dealers were receiving average tips between $23 a day and $122 a day, or an overall average of $73 a day. Respondent determined that petitioner received $44 per shift in tip income in 1972 and 1973, rather than the average of $6.55 [3] reported on his 1972 return and $12.13 [4] reported on his 1973 return. With respect to 1972, respondent concluded that petitioner was employed for 244 days, but was on vacation for 14 of those days and that he, therefore, shared in the pool of tips for 230 days. Accordingly, he determined that petitioner received a total of $10,120 in tip income in 1972 (230 x $44). Since petitioner reported $1,558 in tip income in 1972, respondent increased petitioner's income by $8,562 *301 ($10,120 - $1,558). In addition, respondent determined that all or a part of the deficiency was due to negligence or intentional disregard of rules and regulations and imposed an addition to tax under section 6653(a) in the amount of $84.50 With respect to 1973, respondent concluded that petitioner received tip income for 257 days (vacation time already deducted). Accordingly, he determined that petitioner received a total of $11,308 in tip income in 1973 (257 x $44). Since petitioner reported $3,166 in tip income in 1973, respondent increased petitioner's income by $8,142 ($11,308 - $3,166). In addition, respondent determined that all or a part of the deficiency was due to negligence or intentional disregard of rules and regulations and imposed an addition to tax under section 6653(a) in the amount of $87.55. [5]
OPINION It is clear that the toke income received by petitioner in 1972 and 1973 while working as a blackjack dealer at the Hilton is taxable *302 income. Olk v. United States,536 F.2d 876 (9th Cir. 1976), revg. 388 F.Supp. 1108 (D. Nev. 1975), cert. denied 429 U.S. 920 (1976). Petitioner has not contended otherwise. He does contend, however, that he did not receive tip income in excess of the amounts reported on his returns for the taxable years 1972 and 1973. The burden of proof is on petitioner to overcome the presumption of correctness that attaches to respondent's determinations. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner maintained no records of his toke income received in 1972 and 1973. In such circumstance, respondent was entitled to reconstruct petitioner's toke income using any reasonable method which, in his opinion, would clearly reflect that income. Catalano v. Commissioner,81 T.C. 8, 13 (1983), affd. (C.A. 9 May 21, 1984); Meneguzzo v. Commissioner,43 T.C. 824, 831 (1965). Respondent has great latitude in reconstructing a taxpayer's income. Giddio v. Commissioner,54 T.C. 1530, 1533 (1970).Where, as in this case, a taxpayer maintains *303 no records, respondent has no other course than to reconstruct income in the most reasonable manner possible. Such reconstructions are rarely, if ever, exact, but they are not required to be. It is enough that the reconstruction be reasonable in light of all the attendant facts and circumstances. Schroeder v. Commissioner,40 T.C. 30, 33 (1963). In Williams v. Commissioner,T.C. Memo. 1980-494, we sustained respondent's determination that blackjack dealers at the Hilton received tokes during the year 1972 in the amount of $44 per shift, concluding that the determination was not arbitrary or excessive. Petitioner contends that he should not be compared with the other Hilton dealers for purposes of determining how much toke income he received in 1972. Yet, petitioner offers us no persuasive means by which we could distinguish his situation from that of the other dealers. There is clearly an element of commonality between all the Hilton dealers working during 1972 since the division of toke income was made on an equal basis among all dealers working during a 24-hour shift. Furthermore, the possibility of any manipulation in the amount received *304 by petitioner seems highly remote given that the tip income was distributed in envelopes bearing no names. Since petitioner has not produced any evidence to indicate that his toke income received in 1972 was less than that determined by respondent, respondent's determination with respect thereto must be sustained, and we so conclude. Respondent's in-depth investigation into the amount of toke income received by the Hilton dealers primarily involved the year 1972, and our decision in Williams v. Commissioner,supra, insofar as it related to toke income received by Hilton dealers, was limited to that year. Respondent contends that there is no logical reason why the $44 figure cannot also be applied to the taxable year 1973 since there is no evidence to indicate any change in the receipt of toke income by the Hilton dealers or the disbursement thereof. Further, respondent notes that most of the personal observations conducted by respondent's undercover agents in order to verify the $44 determination were in fact conducted in the latter part of 1973. In Catalano v. Commissioner,supra, we sustained respondent's reconstruction of toke *305 income received by dealers at Caesar's Palace during the years 1976 through 1979 based on a surveillance program conducted at Caesar's Palace on 48 days during the period February 9, 1976 through January 26, 1977. The surveillance program conducted in that case, although more extensive, was conducted in much the same manner as the surveillance program conducted at the Hilton. We specifically rejected the taxpayers' assertion that the 48 surveillance days represented an insufficient sampling from which to forecast their toke income, noting that the Commissioner selected those days pursuant to a "stratified random sampling plan" designed to account for variations in toke income which generally occurred on different days of the week and at different times of the years. We further noted that the record contained no evidence indicating a change in circumstances after 1976 which would support a finding that the dealers' toke income declined after the surveillance program was completed and during some of the years at issue. 81 T.C. at 15-16. In the instant case respondent's undercover agents observed the dealers' exchanges of tokes at the cashier's cage on 11 days during *306 the period November 28, 1973 through August 16, 1974. Nine of those observations occurred in 1973. In conducting their surveillance project, the agents were careful to select different days of the week, some on which they thought the toke rate would be high, others on which they thought the toke rate would be low, and still others on which they thought the toke rate would be average. They concluded, based on their personal observations, that the average toke income per shift was approximately $73. Respondent does not contend that petitioner should be charged with having received $73 in toke income per shift in 1973. He seeks only to charge petitioner with $44 in toke income per shift in 1973. While we might well have preferred a more extensive surveillance project for purposes of determining the toke income received by petitioner in 1973, taking all of the facts into consideration, we do not believe that respondent's reconstruction of toke income in 1973 was arbitrary or excessive. There is nothing in the record to indicate that the toke rate in 1973 was less than the $44 rate determined for 1972. If anything, the results of the surveillance project tend to suggest that the *307 rate increased in the later year. Yet, in formulating his determinating for 1973, respondent refrained from increasing the toke rate based on a limited surveillance project primarily intended to varify the $44 rate determination. Since petitioner has not produced any evidence to indicate that his toke income in 1973 was less than that determined by respondent, respondent's determination with respect thereto must be sustained, and we so conclude. Respondent also determined that petitioners are liable for additions to tax under section 6653(a) for the years in question. Section 6653(a) provides for an addition to tax where any part of an underpayment is due to negligence or intentional disregard of rules and regulations. The burden of proof is on petitioners to show that the additions were improperly imposed. Enoch v. Commissioner,57 T.C. 781, 802 (1972). Section 6001 and the regulations thereunder require petitioner to keep adequate records. Petitioner failed to maintain records with respect to his toke income, and consequently we must sustain respondent's determinations of additions to tax under section 6653(a). Decisions will be entered for the respondent. *308 Footnotes
1. Julia Fernandez did not sign the stipulation of facts. However, because she has not challenged the facts stipulated to by Humberto J. Fernandez and respondent, and because there is nothing in the record to cast doubt on those facts, we find them accordingly.↩
2. The stipulation of facts refers to the hotel as the Las Vegas Hilton Hotel. Other documentary evidence in the record refers to the hotel as the Las Vegas International Hotel, Inc. Taking all of the evidence into consideration, it is apparent that the Las Vegas Hilton Hotel and the Las Vegas International Hotel, Inc. are one and the same.↩
3. Tips reported of $1,558 divided by 238 (248 days paid - 10 vacation days) equals $6,55. ↩
4. Tips reported of $3,166 divided by 261 (271 days paid - 10 vacation days) equals $12.13.↩
5. Although the parties have stipulated that petitioner worked more days in 1972 and 1973 than respondent took into account in formulating deficiencies, respondent has not asked the Court for increased deficiencies.↩