NORMAN R. DAVIES AND JUDITH A. DAVIES, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent DAVIES v. COMMISSIONER
Docket Nos. 5080-77, 7815-78, 7816-78, 7817-78, 7818-78, 7945-78.
United States Tax Court
T.C. Memo 1981-438; 1981 Tax Ct. Memo LEXIS 309; 42 T.C.M. (CCH) 768; T.C.M. (RIA) 81438; August 17, 1981. *309 The male petitioners worked as blackjack (21), big wheel (Big 6), and roulette dealers at a Las Vegas, Nevada, casino-hotel. Respondent determined deficiencies based on "toke" income in addition to the amounts petitioners reported. Held: (1) Equitable estoppel and laches do not bar respondent's deficiency determinations. (2) Respondent's determinations were not arbitrary and excessive and so are presumptively correct. (3) Tokes constitute taxable income. (4) Amounts of toke income are determined. (5) Statute of limitations does not bar deficiencies for 1969 and 1970 in docket No. 7945-78. Secs. 6501(e)(1) and 6501(c)(4), I.R.C. 1954. Robert A. Jones and John L. Peterson, for the petitioners. Craig D. Platz and Gordon W. Cook, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax against petitioners as follows: Docket No.
Petitioners
Year
Deficiency
5080-77
Norman R. Davies and
Judith A. Davies
1969
$ 3,298.80
1970
3,396.22
1971
4,380.16
7815-78
John J. McDonald and
Doris A. McDonald
1969
3,102.93
1970
2,939.80
1971
3,358.55
7816-78
Harold Chausmer and
Marilyn Chausmer
1969
3,291.00
1970
3,003.52
1971
3,395.36
7817-78
Ralph Stanton
1969
2,590.39
1970
2,654.35
1971
2,897.67
7818-78
Leo Trefiletti and
Rosemary Trefiletti
1969
3,312.36
1970
2,648.22
1971
3,285.92
7945-78
Howard F. Keogh and
Mildred E. Keogh
1969
2,117.69
1970
2,896.30
1971
2,763.52
These *310 cases have been consolidated for trial, briefs, and opinion. The issues for decision are: [2]
(1) Whether respondent is estopped from asserting the deficiencies herein and whether the defense of laches is applicable; (2) Whether respondent's determinations were so arbitrary and excessive as to deny the usual presumption of correctness *311 to the determinations in the notices of deficiency; (3) Whether "tokes" are income; (4) Whether petitioners reported all tokes received by the male petitioners in 1969, 1970, and 1971, and if not, the correct amount of the tokes; and (5) Whether the statute of limitations bars assessment of deficiencies against petitioners Howard F. Keogh and Mildred E. Keogh (docket No. 7945-78) for 1969 and 1970. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petitions in these cases were filed, all the petitioners resided in Las Vegas, Nevada, with the exception of Ralph Stanton who resided in Mesa, Arizona. During the years 1969 through 1971, petitioners Norman R. Davies, John J. McDonald, Harold Chausmer, Ralph Stanton, Leo Trefiletti, and Howard F. Keogh (hereinafter sometimes referred to individually as "Davies", "McDonald", "Chausmer", "Stanton", "Trefiletti", and "Keogh", respectively, and collectively as "the petitioner-dealers") were employed by M & R Investment Company, Inc., dba Dunes Hotel & Country Club (hereinafter referred to as "the Dunes"), in Las Vegas as backjack ("21"), *312 big wheel ("Big 6"), and roulette dealers (hereinafter referred to collectively as "21 dealers"). During their employment at the Dunes' casino, the petitioner-dealers earned regular wages based on an hourly rate which was paid to them semimonthly. The petitioner-dealers generally worked an eight-hour shift, although they sometimes worked overtime for which they received overtime pay. The Dunes' casino maintained three daily work shifts--day, swing (evenings), and graveyard (night"), with each shift having staggered starting times. In addition to their wages, the petitioner-dealers received cash or chips, [3] called tokes or tips (hereinafter sometimes referred to as "tokes"), from some of the gambling players. A 21 dealer at the Dunes' casino received tokes either by a player handing the toke to the 21 dealer, or as the result of a player placing a bet for the 21 dealer. If the bet was not successful, the Dunes received the entire amount of the bet. If the bet was successful, the player designated all, none, or a portion of the total as a toke belonging to the 21 dealer. When a 21 dealer received a toke, *313 he signaled his supervisor by knocking the cash or chip on the table, and then placed the cash or chip in his shirt pocket. During the years 1969 through 1971, all 21 dealers at the Dunes' casino deposited the tokes they received in a common toke box before leaving the "pit area" at their breaks or at the change of shifts. (The "pit area" is designated as such and consists of a group of gaming tables clustered in the casino.) The tokes in the toke box for a day were divided equally among all 21 dealers who worked that day. Several of the 21 dealers counted, divided, and distributed the tokes at the end of each day (every 24 hours). Twenty-one dealers at the Dunes' casino received tokes every day they worked. The Dunes' management knew of and acquiesced in this practice. Tokes received by craps dealers at the Dunes' casino were generally higher in amount, and fluctuated more, than tokes received by 21 dealers; craps dealers did not share their tokes with 21 dealers. The Dunes employed floormen in a supervisory role, to watch the games to ensure that the tables were adequately supplied with chips and the games were fairly operated. Occasionally, a 21 dealer would temporarily be *314 assigned to fill in as a floorman. Twenty-one dealers working as temporary floormen shared in tokes until some time in the early 1970's. During the years in issue: Davies dealt 21 and roulette and sporadically worked as a floorman in 1970 and 1971; McDonald predominantly dealt 21, and occasionally dealt craps and worked as a floorman; Chausmer dealt 21 exclusively; Stanton dealt 21 and Big 6; Trefiletti generally dealt roulette, occasionally dealt craps, and rarely dealt 21; Keogh dealt 21 and roulette, but was out of work for about three months after he broke his arm on October 1, 1969. During the years in issue, the petitioner-dealers worked at the Dunes' casino the numbers of days shown in table 1. These totals do not include sick leave and vacations. Table 1 Petitioner-dealer
1969
1970
1971
Davies
279
272
267
McDonald
277
264
249
Chausmer
292
269
264
Stanton
236
234
220
Trefiletti
290
234
238
Keogh
195
218
218
During the years in issue, the petitioner-dealers earned the gross wages shown in table 2 as 21 dealers at the Dunes' casino. Table 2 Petitioner-dealer
1969
1970
1971
Davies
$ 8,714.96
$ 8,681.68
$ 8,645.14
McDonald
7,623.42
7,434.69
7,794.00
Chausmer
8,554.13
7,827.25
8,041.44
Stanton
7,200.03
7,361.30
7,527.63
Trefiletti
9,113.79
7,582.41
8,374.66
Keogh
5,946.52
6,684.88
6,985.82
*315 During the years in issue, the petitioner-dealers reported to the Dunes tokes received in the amounts shown in table 3. Table 3 Petitioner-dealer
1969
1970
1971
Davies
$ 1,016
$ 984
$ 1,008   McDonald
741 666
775   Chausmer
744 820
852   Stanton
756 742
715   Trefiletti
735 632.50
680   Keogh
960 733
1,022.60
The amount of "wages paid subject to withholding" reflected on each petitioner-dealer's Form W-2 issued by the Dunes for 1969, 1970, and 1971, respectively, included the petitioner-dealer's wages (table 2) and declared tokes (tables 3) for that year. Each petitioner-dealer reported this amount as gross income on his Federal individual income tax returns for the years in issue. The petitioner-dealers did not report any tokes on their income tax returns for the years in issue except those reported to the Dunes and included in their Forms W-2. Davies, McDonald, Chausmer, Stanton, and Trefiletti, did not maintain records of the amount of tokes actually received and generally reported about ten percent of their gorss wages as toke income. A substantial number of dealers did the same thing; generally, their Federal income tax returns were accepted without audit. Keogh kept a monthly toke income *316 record, but destroyed it after reporting monthly toke income to the Dunes. For the years in issue, the petitioner-dealers reported to the Dunes average daily tokes in the amounts shown in table 4 (table 3 amounts divided by table 1 amounts). Table 4 Petitioner-dealer
1969
1970
1971
Davies
$ 3.64
$ 3.62
$ 3.78
McDonald
2.68
2.52
3.11
Chausmer
2.55
3.05
3.23
Stanton
3.20
3.17
3.25
Trefiletti
2.53
2.70
2.86
Keogh
4.92
3.36
4.69
Weighted average
3.16
3.07
3.47
If a 21 dealer was sick more than three days at a time, then after the third day he would share in the tokes at a flat rate of $ 20 per day. This $ 20 amount for a day would come out of that day's total tokes, reducing the amount otherwise to be divided equally among the 21 dealers who worked that day. This practice started after the end of 1969. Davies became a full-time floorman in 1973 or 1974. Before he became a full-time floorman, his wages as a 21 dealer were $ 32 per day; when he became a full-time floorman, his wages were $ 75 per day; his wages then were increased to $ 80 per day. Davies also received a bonus as a full-time floorman. John Whitlock, Jr. (hereinafter referred to as "Whitlock"), was employed by the Dunes during the period March 4, *317 1967, through May 7, 1970. Whitlock worked in the Dunes' casino initially as a craps dealer and later as a 21 dealer. Whitlock's employment by the Dunes was terminated on May 8, 1970; the reason noted on his termination slip was "work unsatisfactory". During his employment by the Dunes, Whitlock maintained a diary with a separate page for each month of the period March 1967, through February 1970. The date of the month and day of the week were listed on the left side of each page, with separate vertical columns designated "gross", "net", "tax", and "tips"; beginning with January 1968, an additional column was designated "F.I.C.A."; beginning with April 1969, a further column was designated "insurance". Entries of wages received from the Dunes were made approximately every two weeks. An entry of "off", "sick", "vac", or a dollar amount was made in the diary under the column designated "tips" for each day. Whitlock usually made entries in the diary after arriving home from his shift at the Dunes' casino. Occasionally, Whitlock would not make an entry for three or four days after which time he would then make them from information kept in his wallet. Whitlock seldom made an entry *318 in the diary during his days off work. Table 5 shows the lowest and highest amounts in the tips column of Whitlock's diary for each month from March 1967, through February 1970. Table 5 1967
1968
1969
1970
Month
Low
High
Low
High
Low
High
Low
High
Jan
18
54
24
86
30
110
Feb
20
53
25
117
29
67
Mar
53
14
57
31
80
Apr
94
12
60
16
72
May
130
23
85
34
110
Jun
150
17
44
23
87
Jul
15
50
12
66
38
89
Aug
14
67
23
56
30
74
Sept
20
61
20
65
27
78
Oct
12
50
20
67
29
100
Nov
12
49
25
75
30
70
Dec
13
60
30
73
23
75
The last dated tips column amount less than $ 20 was $ 16 for Tuesday, April 1, 1969. Total tips shown in the diary were $ 6,279.18 for 1967 (from March 1), $ 10,423 for 1968, $ 12,815 for 1969, and $ 1,947 for 1970 (through February 23). Whitlock reported to the Dunes tokes of $ 419 in 1968, § 382 in 1969, and $ 58 in January through April of 1970. Whitlock did not report any tokes on his 1969 and 1970 Federal individual income tax returns except those reported to the Dues and included in his Forms W-2. Whitlock and Barbara Mikle (hereinafter referred to as "Mikle"), his then wife, were convicted of receiving stolen property. Whitlock had a poor reputation for honesty and truthfulness. In late 1973, the District Director of the Internal Revenue Service (hereinafter sometimes *319 referred to as "the IRS") held a meeting at the Las Vegas Convention Center to which all the dealers in Las Vegas were invited. At that meeting, the District Director told the dealers that "ten percent" was a thing of the past and from that point on they would have to accuratelyrecord and report their tokes. Moreover, he stated that the IRS intended to collect unreported tokes back to 1969 and that only those dealers not under criminal investigation would be allowed to settle their cases. The petitioner-dealers were among a group of twenty-eight 21 dealers employed by the Dunes who were notified in late 1972 that they were under criminal investigation for evasion of income taxes because of underreporting of tokes for 1969, 1970, and 1971. Although the audits of the petitioner-dealers' returns for the years in issue were completed by November 20, 1973, respondent took no action, either criminal or civil, pending the outcome of Olk v. United States, 388 F. Supp. 1108 (D. Nev. 1975), revd. 536 F.2d 876 (CA9 1976). After the United States District Court ruled that tokes were gifts in Olk v. United States, supra, the criminal proceedings pending against the petitioner-dealers were *320 dropped and respondent proceeded in the instant cases. For the notices of deficiency in the instant cases, respondent determined unreported tokes of the petitioner-dealers in part by using the toke data in Whitlock's diary directly,and in part by statistically projecting tokes from the toke data in Whitlock's diary for the period July 1, 1967, through February 28, 1970. For 1969 and 1970, the time cards of each petitioner-dealer were compared with Whilock's diary to determine the days that both Whitlock and the particular petitionr-dealer worked. For these days, respondent used the amount of tokes recorded in Whitlock's diary as that petitioner-dealer's tokes. For the days in 1969 and 1970 on which any of the petitioner-dealers worked and Whitlock did not work, and for all of 1971, respondent used the toke data in Whitlock's diary to statistically compute assumed average daily tokes for each day of the week. Respondent's statistical analyst plotted Whitlock's toke data on graphs for each day of the week. In the judgment of respondent's statistical analyst, a straight line "best fit" the graphically displayed data. Then, respondent's statistical analyst used the Least Squares *321 Method of Linear Regression to statistically project assumed average daily tokes through 1971. The results of this computation are shown in table 6: Table 6 Average Daily Toke Income
Day of the Week
1969
1970
1971
Sunday
$47.48
$ 58.77
$ 67.31
Monday
42.04
49.46
56.74
Tuesday
42.84
53.08
63.13
Wednesday
45.60
56.68
67.55
Thursday
49.10
58.27
67.26
Friday
52.21
59.31
66.28
Saturday
55.59
65.01
74.24
Respondent then applied the daily amounts in table 6 to the days worked by each petitioner-dealer for the respective years (other than the days in 1969 and 1970 for which there was toke information in Whitlock's diary). To the amounts thus computed for each of the petitioner-dealers for each of the years in issue, respondent added the amounts in Whitlock's diary for each day that both Whitlock and that petitioner-dealer worked. From these sums, respondent subtracted ten percent to allow for variability in the statistical projection of the tokes. In connection with these determinations, respondent's statistical analyst did not consult with any experts in the gaming industry (outside of the IRS) concerning tokes, and did not consider factors such as the economy, type of game, limits on amounts that can be bet for dealers, *322 amount of money placed in action, percentage won by the Dunes, season of the year, or effect, if any, of holidays. In projecting toke income for the petitioner-dealers, respondent's statistical analyst assumed that the diary information was accurate in at least the following respects: (1) that Whitlock was employed exclusively as a 21 dealer at the Dunes' casino from July 1, 1967, through February 28, 1970; and (2) that the diary was in fact an accurate record of Whitlock's toke receipts. Petitioners Keogh and Mildred E. Keogh reported gross income of $ 18,198 and $ 9,822 on their timely filed 1969 and 1970 joint Federal individual income tax returns, respectively. On February 2, 1976, they filed a signed consent extending the statute of limitations for 1969 until April 15, 1977. On November 4, 1976, they filed a signed consent extending the statute of limitations for 1969 and 1970, until April 15, 1978. The notice of deficiency was mailed to them on April 12, 1978. Petitioners reported, respondent determined, and we find that the petitioner-dealers received, toke income in the years in issue in the amounts set forth in the appropriate columns of table 7. Table 7 Toke Income Reported
Toke Income Determined
by Petitioners [4]
by Respondent
Davies
1969
$ 1,016
[5] $ 12,816.39
1970
984
[5] 13,846.10
1971
1,008
[5] 16,314.68
McDonald
1969
741
12,482.88
1970
666
13,541.81
1971
775
15,210.71
Chausmer
1969
744
13,207.44
1970
820
13,658.45
1971
852
15,552.59
Stanton
1969
756
10,712.48
1970
742
11,683.63
1971
715
12,739.82
Trefiletti
1969
735
13,443.87
1970
632.50
12,007.34
1971
680
14,233.15
Keogh
1969
960
9,127.61
1970
733
10,946.17
1971
1,022.60
12,856.61
*323 Toke Income Found
by the Court
Davies
1969
$ 12,600
1970
11,600
1971
10,300
McDonald
1969
12,300
1970
11,100
1971
10,000
Chausmer
1969
13,000
1970
11,400
1971
10,500
Stanton
1969
10,500
1970
9,700
1971
8,500
Trefiletti
1969
13,200
1970
10,100
1971
9,700
Keogh
1969
8,900
1970
9,000
1971
8,700
OPINION As a preliminary matter, we note that neither estoppel nor the statute of limitations is raised in any of the petitions in these cases, contrary to the requirements of Rule 39. [6] However, the parties may consent to try issues not raised in the pleadings; such issues are treated in all respects as if they had been raised in *324 the pleadings. Rule 41(b)(1). Since the parties by stipulation have expressly consented to present the estoppel issue (see Southern Pacific Transportation Co. v. Commissioner, 75 T.C. 497, 838 (1980), regarding the relationships among various types of estoppel) and, with respect to docket No. 7945-78 only, the statute of limitations issue, we conclude that both of these matters are before the Court for determination. I. Equitable Estoppel and Laches
Petitioners assert that respondent retroactively abandoned a policy of allowing dealers to report approximately ten percent of their wages as toke income. They assert that--(1) because they relied on the ten-percent policy and (2) because of delays in the instant cases by respondent--they cannot be expected to now precisely reconstruct their toke income. Accordingly, petitioners contend that respondent is equitably estopped from determining the deficiencies. Respondent argues that petitioners' asserted gronds have no factual support in the record and are insufficient to justify application of the doctrine of equitable estoppel in *325 any event. We agree with respondent. Firstly, petitoners have failed to prove the facts which would give rise to an estoppel. The record fails to show any advice by respondent that petitioners need not keep accurate records of toke income, or that toke income in excess of ten percent of their wages is not taxable. At most, the record suggests that, in earlier years, respondent accepted petitioners' Federal income tax returns without disputing any reported amounts of toke income. Acceptance by respondent of prior years' returns does not preclude respondent's determination of tax liability for other years. Yeaman v. United States, 584 F.2d 322, 326 (CA9 1978); Meneguzzo v. Commissioner, 43 T.C. 824, 836 (1965). On this record, we would not invoke the doctrine of equitable estoppel, even were we allowed to do so. See Boulez v. Commissioner, 76 T.C. 209, 214-215 (1981); Underwood v. Commissioner, 63 T.C. 468, 477-478 (1975), affd. 535 F.2d 309 (CA5 1976); Schwartz v. Commissoner, 40 T.C. 191, 193 (1963). Secondly, even were we able to find that respondent's agents misled petitioners about the tax consequences of failing to keep records and to report their full toke income, we would *326 be unable to grant petitioers the relief they ask. Such a position would be in the nature of a statement of law issued to the general public. The doctrine of equitable estoppel does not bar respondent from correcting a mistake of law. Automobile Club of Michigan v. Commissioner, 353 U.S. 180 (1957). Respondent may correct a mistake of law "even where a taxpayer may hve relied to his detriment on the Commissioner's mistake." Dixon v. United States, 381 U.S. 68, 73 (1965); Yeaman v. United States, 584 F.2d at 326. We conclude that the instant cases are not the appropriate ones for the application of equitable estoppel. See Schwartz v. Commissioner, 40 T.C. at 193; Stevens Bros. Foundation, Inc. v. Commissioner, 39 T.C. 93, 108 (1962), affd. in part and revd. in part 324 F.2d 633 (CA8 1963); Lorain Avenue Clinic v. Commissioner, 31 T.C. 141, 164-165 (1958). Petitioners also appear to be raising the defense of laches, pointing to the alleged delays caused by the respondent. The prescribed time in which the Commissioner can act has been fixed by the statute of limitations; we are not at liberty to shorten or lengthen that time on a theory of laches. Saigh v. Commissioner, 36 T.C. 395, 424-425 (1961). *327 See Automobile Club of Michigan v. Commissioner, 353 U.S. at 187. Petitioners could have refused to sign waivers of the statute of limitations. Refusals to sign the waivers might well have resulted in the issuance of notices of deficiency by respondent to toll the statute of limitations. Then petitioners could have petitioned this Court and obtained their hearing at an earlier date. In addition, petitioners' continuing dispute with respondent, while very likely appearing to be vexatious, served to put petitioners on notice of their need to prepare for litigation on the very matters in dispute in the instant cases. Even though the early threat was of criminal proceedings, it is clear that, in tax matters, criminal proceedings many times are followed by civil proceedings whether the criminal cases result in conviction ( Amos v. Commissioner, 43 T.C. 50 (1964), affd. 360 F.2d 358 (CA4 1965)) or acquittal ( Helvering v. Mitchell, 303 U.S. 391 (1938)). In other words, the continuing delay provided many opportunities for petitioners to gather the information necessary for them to prosecute the instant cases, in sharp contrast to the situation presented in United States v. Matheson, 532 F.2d 809, 820-821 (CA2 1976), *328 and Southern Pacific Transportation Co. v. Commissioner, 75 T.C. at 840-842. Petitioners state that "the taxpayer must either be requied to keep accurate records or given an option of reporting a fixed amount proportional to his salary." They assert that "[t]his, of course, is the same method that is used in choosing between the 'standard deduction' and itemized deductions. No one would contend that the standard deduction is precise; however, it is reasonable under the rules." The primary flaw in petitioners' argument is that the standard deduction was, for the years in issue, [7] specifically provided for bystatute--viz., section 141 [8]--but the asserted ten-percent policy was not. Also, whatever might be the legal status of such a policy if one had been enunciated explicitly by respondent, all that we have before us is an acceptance of tax returns and not a policy of authorizing taxpayers to exclude taxable income. Finally, no empirical relationship has been shown, either on the record before us or in literature of which we are aware, between amounts of wages and amounts of tokes. Floormen at the Dunes' casino did not share in the dealers' tokes but received substantially greater *329 wages than dealers. Indeed, one might assume that the likelihood of large amounts of tokes would make a dealer willing to accept a lower wage rate. In summary, we find that petitioners have not established a nexus between the amounts of tokes and their wages which would support reporting a fixed ratio of tokes to wages. Petitioners refer to "the 'doctrine of consistency' of IRS accepting the 10% reporting practice and then changing its position retroactively." Although this may technically be quasi-estoppel, rather than equitable estoppel, in effect this is merely another way of articulating the concepts clearly dealt with in Automobile Club of Michigan v. Commissioner, supra; Dixon v. United States, supra; Yeaman v. United States, supra; Meneguzzo v. Commissioner, supra.
We hold, for respondent, that no form of estoppel applies in the instant cases. II. Burden of Proof
Petitioners *330 contend that respondent's determinations are without rational foundation and excessive in that the information used by respondent to reconstruct their income was untrustworthy and insufficient to establish the correctness of the deficiencies. Therefore, petitioners assert, the burden of proof is on respondent. Respondent, on the other hand, contends that the notice of deficiency is entitled to the ordinary presumption of correctness and, consequently, petitioners must establish respondent's determination is erroneous. We agree with respondent. Respondent's determinations as to matters of fact in the notice of deficiency are presumed to be correct and petitioners have the burden of showing that these determinations are wrong. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142. However, if petitioners show that respondent's determinations were excessive, then petitioners are not liable for the full amount determined by respondent; this is so even though petitioners fail to establish the correct amount of the tax. Helvering v. Taylor, 293 U.S. 507 (1935). [9]
What *331 petitioners seek in their effort to shift the burden of proof is to require us to sustain the correctness of their Federal income tax returns, except to the extent that respondent proves these returns were erroneous. We do not believe that the instant cases furnish an appropriate occasion for such a shift in the burden of proof. Firstly, in the instant cases, there is no dispute that each of the petitioner-dealers received tokes each day of employment in each of the years in issue. The parties have no dispute as to which days each of the petitioner-dealers was employed. For each petitioner-dealer this activity was his full-time employment (see table 1, supra). The only basic dispute is the amount of the tokes received. In this respect, the instant cases differ from Llorente v. Commissioner, 649 F.2d 152, 156 (CA2 1981), affg. in part and revg. in part 74 T.C. 260 (1980); Weimerskirch v. Commissioner, 596 F.2d 358 (CA9 1979), revg. 67 T.C. 672 (1977); and Jackson v. Commissioner, 73 T.C. 394 (1979). In the foregoing cases it was ultimately concluded that there was an insufficient showing that the taxpayers involved either were in the businesses from which respondent had determined *332 the taxpayers' derived gross income, or were in the businesses for the periods covered by respondent's determination. Secondly, in the instant cases, respondent came forward with evidence explaining how the deficiency determinations were constructed. Although we may disagree with some of the methodology used and assumptions made, respondent's use of Whitlock's diary clearly is a rational way to proceed. What we conclude to be errors made by respondent in this regard are not of such magnitude or such nature "that the commissioner's determination [is] shown to be without rational foundation". Helvering v. Taylor, 293 U.S. at 514. Thirdly, petitioners challenge respondent's methodology as being arbitrary. If a taxpayer fails to keep records or the records kept do not clearly reflect income, then respondent may reconstruct the taxpayer's income by any reasonable method. E.g., Gordon v. Commissioner, 572 F.2d 193, 195 (CA9 1977), affg. in part and revg. in part 63 T.C. 51 (1974), supplemental opinion 63 T.C. 501 (1975); Mendelson v. Commissioner, 305 F.2d 519 (CA7 1962), affg. a Memorandum Opinion of this Court; [10]Conforte v. Commissioner, 74 T.C. 1160, 1181-1182 (1980), and cases *333 cited therein; Meneguzzo v. Commissioner, supra; Sutherland v. Commissioner, 32 T.C. 862, 867 (1959). Davies, McDonald, Chausmer, Stanton, and Trefiletti maintained no records of their toke income. Keogh destroyed whatever record he maintained. Because of the great discrepany between what Keogh reported to the Dunes, and what Whitlock's diary shows, we conclude that such records as Keogh kept (if they matched what he reported) failed to clearly reflect his income. Respondent's approach seems reasonable under the circumstances of the instant cases. Finally, petitoners assert that respondent should have the burden of proof because of unconscionable actions and procedures on respondent's part, including: (1) "the [IRS'] decision to initially pursue criminal fraud charges against these men [the petitioner-dealers]", (2) the assertion that petitioners "were intimidated for years into signing consents extending the Statute of Limitations", (3) the delay when the IRS could have issued notices of deficiency as early as November or December 1973, and (4) the failure of the IRS to give up the search for unreported income when various reconstruction methods failed to *334 disclose any unreported income. We find none of these arguments persuasive. There is no evidence in the record indicating that it was unreasonable for respondent initially to investigate the petitioner-dealers for criminal fraud or seek convictions thereon. There is no evidence that the IRS intimidated the petiioners into signing waivers; they could have refused to sign such waivers at any time and pursued their remedies in this Court. Moreover, respondent's delays were within the period established by the Congress. See discussion under I. Equitable Estoppel and Laches, supra. Finally, as we have already stated, in the absence of records that clearly reflect income, respondent may reconstruct income using any reasonable method. A taxpayer's ability to thwart respondent's reconstruction of income by one or more methods should not preclude respondent's use of any other reasonable method available to him. We hold that respondent's determination is rationally based and presumptively correct, and that the burden of proof (especially the burden of persuasion) remains on petitioners. III. Tokes--Income or Gifts
Petitioners assert that the tokes they received are gifts, excludable *335 from gross income under section 102. Respondent contends that the tokes are includible in gross income, like tips. Petitioners claim that tokes are not compensation for personal services becaue the services they performed were for the Dunes, not the players. We agree with respondent. Tokes are includible in gross income under section 61(a)(1). [11]Olk v. United States, 536 F.2d 876, 879 (CA9 1976), Bevers v. Commissioner, 26 T.C. 1218 (1956). Petitioenrs maintain that the Court of Appeals erred in Olk (and, presumably, that we erred in Bevers). However, we are given no persuasive reason to depart from the analysis of these cases. We hold for respondent on this issue. IV. Amounts of Toke Income
Respondent asserts that the petitioner-dealers received the amounts of toke income determined in the notices of deficiency. [12] Petitioners assert that they reported the correct amounts of tokes *336 to the Dunes, and, through the Forms W-2 from the Dunes, the correct amounts on their Federal income tax returns. Our determinations are set forth in table 7, supra. We do not believe that the tokes reported by petitioners for the years in issue fairly approximated the tokes the petitioner-dealers received during these eyars; we come to this conclusion without regard to Whitlock's diary or respondent's statistical analysis. The reported tokes averaged only $ 2.52 to $ 4.92 per day for these years. (See table 4, supra.) We do not believe so elaborate a toke-sharing arrangement as set forth in our Findings of Fact, supra, would have been established and maintained for such small daily amounts. We do not believe a dealer who was sick would receive a flat $ 20 per day share in tokes if his colleagues on *337 the job were averaging only about one-sixth that amount. If the tokes were only $ 3 to $ 4 per day, we do not believe that 21 dealers would object to sharing the tokes with their colleagues on temporary floorman duty. Whitlock's diary is the basic piece of evidence in this case. Mikle testified with regard to the diary. She saw Whitlock purchase the original book. She saw him make entries in it on almost a daily basis. He told her tha he entered in the diary the amounts of his toke income. The diary included payroll data consistent with the Dunes' payroll records, except for the amounts of the toke income. The diary showed toke income approximately 30 times as much as Whitlock reported to the Dunes. During one of the periods when Whitlock moved out of the family home, Mikle brought the original diary to the IRS. When Whitlock demanded the return of the diary, Mikle secured it from the IRS, but not until after it was photocopied and each page was examined by Mikle, who verified that it was indeed a correct copy of the original. The original then was returned to Whitlock. Neither Whitlock nor the original diary was presented at the trial. The only information available to *338 the Court was that the original probably was in Whitlock's possession or control and that Whitlock had told respondent's counsel he would be in Mexico at the time of the trial. Both Whitlock and Mikle were convicted of receiving stolen property. Nevertheless, our observation of Mikle at the trial and our examination of Whitlock's diary convince us that Mikle's testimony and Whitlock's declarations as to the matters before us are trustworthy. Petitioners object to the admissibility of Whitlock's diary because (1) the best evidence is the original of the diary which was not produced at trial; (2) the probative value of the diary is substantially outweighed by the danger of unfair prejudice in that Whitlock's reputation for truth and veracity is poor and the amounts reported by Whitlock to the Dunes and on his Federal income tax returns differed from the diary amounts; and (3) the diary is hearsay. In response to petitioners' objections, we conclude that Rule 1002 of the Federal Rules of Evidence does not require exclusion of the photocopy of Whitlock's diary. Fed. R. Evid. 1001(4), 1003, 1004(2). We further conclude that none of the considerations in Rule 403 of the Federal Rules of Evidence *339 requires exclusion of the diary. We agree that the diary is hearsay under Rule 801 of the Federal Rules of Evidence. However, we conclude that Rule 802 of the Federal Rules of Evidence does not require exclusion of the diary. Fed. R. Evid. 803(6), 804(b)(3). We recognize that, as is often the case with hearsay, petitioners are disadvantaged by not being able to cross examine the declarant (Whitlock). We take that into account, as we do Whitlock's criminal conviction and his poor reputation for honesty and truthfulness. Nevertheless, we remain convinced that the amounts recorded in the diary under the tips column are Whitlock's true records of tokes he received and we have no reason to doubt their general accuracy. Both sides agree that Whitlock was a 21 dealer from April 16, 1969, onward. There is a dispute as to whether, during the period from July 1, 1967, through April 15, 1969, Whitlock was a craps dealer or a 21 dealer. Credible evidence points inconclusively in each direction. Respondent's statistical analyst concluded that the daily patterns of tokes recorded in Whitlock's diary could best be described in graphic form by a single straight line for each day. As to the *340 years in issue, the straight lines (rather than the amounts set forth in the diary) were the bases for respondent's determinations as to all of 1971, most of 1970, and scattered days in 1969. All the lines showed positive slopes (i.e., increasing amounts), because of the 1967 and 1968 data from the diary. (Analysis of only the 1969 and 1970 diary amounts would have yielded essentially zero slopes (i.e., constant amounts).) In respondent's analysis, the slopes for Wednesday and Tuesday were the most positive, resulting in the asserted average toke amounts for those days growing much faster than for the other days of the week. Respondent does not dispute that this result of the analysis as to Wednesday and Tuesday appears to be in conflict with what happens in the real world. Respondent's statistical analyst assures us that this result nevertheless follows ineluctably from his decisions (1) to take into account all the diary toke data from July 1, 1967, onward and (2) to fit a single straight line to the data for each day of the week. Although the calculations of the straight lines followed standard statistical practice, the decision to use a single straight line was made "by *341 inspection" and not otherwise explained. In arriving at our conclusions as to the petitioner-delers' toke income, we have taken into account (1) petitioners' inability to cross examine Whitlock, (2) the uncertainty as to when Whitlock shifted from craps dealing to 21 dealing, and (3) the inappropriateness of fitting all the data to a set of single straight lines. Also, we have taken into account the fact that any lines we draw as to periods after February 27, 1970 (the last diary entry date), are progressively less reliable the further we depart from this date. In addition, we believe a small adjustment is appropriate as to Davies for 1971 to take account of the likelihood that, on some occasions during that year, he served as temporary floorman without sharing in the tokes. As to McDonald, the negative adjustment that might be appropriate because he occasionally served as temporary floorman (if he did so serve in 1971) would be balanced against a positive adjustment because he occasionally dealt craps; we make neither adjustment. On the basis of the evidence in the record in the instant cases, we have made the findings reflected in the right-hand column of table 7, supra, and *342 hold that the petitioner-dealers received as their total toke incomes the amounts there shown for the years there indicated. V. Statute of Limitations
Petitioners Keogh and Mildred E. Keogh contend that respondent is barred by the statute of limitations from assessing deficiencies for 1969 and 1970. They assert that both the three-year period of limitations under section 6501(a)[13] and the six-year period of limitations under section 6501(e)[14] *343 have expired for 1969; that the three-year period of limitations has expired for 1970; and that the six-year period of limitations is not applicable to 1970 because respondent has failed to prove that they omitted toke income in excess of 25 percent of the amount of gross income stated in their 1970 tax return. Respondent maintains that the six-year statute of limitations applies to both 1969 and 1970, because petitioners Keogh and Mildred E. Keogh omitted more than 25 percent of gross income for each of these years, and extensions of the statute of limitations for each of these years were timely filed. Therefore, respondent asserts that the notice of deficiency was timely. We agree with respondent. Petitioners have the burden of proving that the general three-year statute of limitations has run by the time the notice of deficiency was mailed. Lawrence v. Commissioner, 3 B.T.A. 40 (1925). Since the 1969 *344 and 1970 tax returns were timely filed and the notice of deficiency was not mailed until 1978, petitioners have borne their burden of proof. Respondent must assume the burden of proving that the statute of limitations has nevertheless not expired. White Eagle Oil & Refining Co. v. Commissioner, 19 B.T.A. 185 (1930). We have found that petitioners Keogh and Mildred E. Keogh omitted $ 7,940 of toke income in 1969 and $ 8,267 of toke income in 1970. [15] The parties agree that petitioners Keogh and Mildred E. Keogh reported gross income of $ 18,198 and $ 9,822 on their 1969 and 1970 Federal income tax returns, respectively. Thus, they omitted more than 25 percent of the amount of gross income stated on their respective tax returns for 1969 and 1970 and the six-year statute of limitations applies. Under section 6501(e), the statute of limitations would not expire before April 15, 1976, for 1969, and April 15, 1977, for 1970. On February 2, 1976 (before April 15, 1976), petitioners Keogh and Mildred E. Keogh filed a signed consent extending the statute of limitations for 1969 until April 15, 1977. On November 4, 1976 (before April 15, 1977), they filed a signed consent extending the *345 statute of limitations for 1969 and 1970 until April 15, 1978. A notice of deficiency for 1969 and 1970 was mailed to them on April 12, 1978. This was within the period of limitations as extended. Sections 6501(e) and 6501(c)(4). [16] On this *346 issue we hold for respondent. To reflect the concessions made by the parties and the conclusions reached herein, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: John J. McDonald and Doris A. McDonald, docket No. 7815-78; Harold Chausmer and Marilyn Chausmer, docket No. 7816-78; Ralph Stanton, docket No. 7817-78; Leo Trefiletti and Rosemary Trefiletti, docket No. 7818-78; and Howard F. Keogh and Mildred E. Keogh, docket No. 7945-78.↩
2. Respondent's adjustment in docket No. 7815-78 for 1969 increasing the amount of the standard deduction is solely derivative; it depends on our resolution of the toke issue. Respondent's adjustments in docket No. 7816-78 for 1969 and 1970, and docket Nos. 7817-78 and 7818-78 for 1969, 1970, and 1971, decreasing the amounts of the medical expense deductions are solely derivative; they depend on our resolution of the toke issue. Respondent's notice of deficiency in docket No. 7818-78 disallowed meals expense deductions for 1970 ($ 133) and 1971 ($ 213). It is not clear whether these adjustments are disputed in the petition. The parties' stipulation as to remaining issues does not include this issue. Petitioners did not dispute these adjustments at trial or on brief. Accordingly, we assume that petitioners are not contesting the meals expense adjustments.↩
3. A chip used in the various gambling games is equivalent to cash in the casino.↩
4. Although petitioners reported these amounts as income, they contest the taxability of these amounts in the isntant cases. See III. Tokes--Income or Gifts, infra. Petitioners have not asked the Court to determine overpayments under section 6512(b) of the Internal Revenue Code of 1954↩. 5. In the notice of deficiency respondent determined Davies' total take income as $ 14,240.43 for 1969, $ 15,384.56 for 1970, and $ 18,127.42 for 1971. On brief, respondent concedes that each of these amounts should be reduced by ten percent, to provide Davies the same adjustment made in the case of the other petitioner-dealers.↩
6. Unless indicated otherwise, all Rule reference are to the Tax Court Rules of Practice and Procedure.↩
7. Title I of the Tax Reduction and Simplification Act of 1977, Pub. L. 95-30, 91 Stat. 127, substituted zero bracket amounts for the standard deduction after 1976. ↩
8. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue.↩
9. In this respect, a taxpayer's burden of proof in this Court may be less than it would be in a refund suit. Helvering v. Taylor, 293 U.S. 507, 514↩ (1935).
10. T.C. Memo. 1961-319↩.
11. SEC. 61. GROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items;↩
12. See note 5, supra, regarding respondent's concessions as to Davies. Also, respondent acknowledges an error as to tokes for Sundays in 1969; he reckoned them as $ 47.48 pr day, but they should have been reckoned as $ 50.06 per day. (See table 6, supra↩.) Respondent points out that correcting this error would result in greater deficiencies, but declines to assert a claim therefor.
13. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General rule.--Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such returnwas filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. ↩
14. Section 6501(e)(1)provides in pertinent part as follows: SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (e) Substantial Omission of Items.--Except as otherwise provided in subsection (c)-- (1) Income taxes.--In the case of any tax imposed by subtitle A-- (A) General rule.--If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed.↩
15. Unreported toke income is computed as follows: ↩
1969
1970
Toke income (table 7, supra)
$ 8,900
$ 9,000
Tokes reported
(table 7, supra)
960
733
Unreported toke income
$ 7,940
$ 8,267
16. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (c) Exceptions.-- (4) Extension by agreement.--Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, except the estate tax provided in chapter 11, both the Secretary or his delegate and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. [The subsequent amendment of this provision by section 1906(b)(13)[sic](A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1834, does not affect the instant cases.]↩